**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Sharon Finkelstein, | No. CV-21-00657-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Prudential Financial Incorporated, et al., | |
| Defendants. | |

Before the Court are both parties' motions to strike and/or exclude or limit the opinions and testimony of each other's expert witnesses. The motions are fully briefed, and the Court held oral argument on August 28, 2023.

**I.   BACKGROUND**

Plaintiff Sharon Finkelstein ("Plaintiff") brought this lawsuit against Defendant Prudential Insurance Company of America ("Defendant") for breach of contract and bad faith arising out of an insurance claim. Plaintiff purchased a long-term care insurance policy with Prudential in 1993. Under the policy, an insured may be entitled to $298 per day in benefits, subject to periodic increases for inflation.

Plaintiff alleges that she is entitled to benefits under the policy since 2008 because she has Arnold-Chiari malformation (hereinafter "Chiari malformation"),[1] Meniere's

---

[1] Chiari malformations are congenital and occur when part of the cerebellum "slips into the foramen magnum at the upper cervical spine," restricting flow of cerebral spinal fluid between the spinal cord and the brain. 4 Attorneys Textbook of Medicine (Third Edition) § 11.03 (2023). At least three types of Chiari malformations exist: Chiari I, Chiari II (also known as Arnold-Chiari malformation), and Chiari III. *Id.*; *see also Chiari Malformations*, Am. Ass'n. of Neurological Surgeons, https://www.aans.org/Patients/Neurosurgical-

disease,[2] and vertigo.[3] (Doc. 1 at 9, 21). Plaintiff claims these conditions leave her unable to perform two or more activities of daily living, as described in the policy. Defendant provided Plaintiff with benefits under the policy for twelve years before her claim was terminated. After an investigation, Defendant's in-house medical director, Dr. John Nye, found that she did not need substantial assistance with her activities of daily living for a recent period of 90 days, so she no longer qualified for benefits under the policy. As a result, Defendant terminated Plaintiff's benefits because this meant that she did not meet the eligibility definition under the policy for "chronic illness or disability," which is now at issue in this case. Plaintiff alleges that Defendant terminated her benefits without reasonable investigation and in breach of the policy. Plaintiff further alleges that Defendant has an "institutional scheme" to eliminate its now-discontinued long-term care insurance plans. Plaintiff seeks compensatory damages that she alleges are owed under the policy, punitive damages, attorneys' fees, and costs. Plaintiff engaged several experts to help prove her case. Defendants also retained its own experts to rebut Plaintiff's case. Both parties now move to exclude or limit each other's experts' opinions and testimony.

## II.  LEGAL STANDARD

### A.  Disclosure Requirements

Rule 26(a)(1), Fed. R. Civ. P., requires that parties promptly disclose the identity of

---

Conditions-and-Treatments/Chiari-Malformation (last visited Oct. 19, 2023). Symptoms from Chiari malformations include headache, neck pain, dizziness, incoordination, and sensory and hearing loss. The severity of the symptoms increase based on the type of malformation, with Type I being the least severe. *Id.* Plaintiff alleges in her Complaint that she has "Arnold-Chiari malformation." (Doc. 1) Both Plaintiff and Defendant, however, use Chiari malformation Type I and Arnold-Chiari malformation interchangeably throughout the briefing even though the literature suggests that these are two different types of Chiari malformation. (*See, e.g.*, Docs. 259 (Plaintiff using "Arnold-Chiari malformation"), 262 (Defendant using "Chiari malformation type I"), 268 (Plaintiff using "Arnold Chiari malformation" and "Arnold Chiari Type I malformation"), 285 (Defendant using "Arnold Chiari malformation"), 291 at 2 (Plaintiff stating "Mrs. Finkelstein suffers from Chiari Malformation Type I.").)

[2] Meniere's disease "presents with paroxysmal symptoms of tinnitus, monaural fullness, fluctuating hearing, and episodic vertigo . . . . Meniere disease is diagnosed only if there is both episodic vertigo and sensorineural hearing loss." 11 Attorneys Textbook of Medicine (Third Edition) § 84.07 (2023).

[3] Throughout the briefing, the parties also refer to other conditions that Plaintiff may have, such as hypertension, thyroid disease, obesity, and others, but these conditions are not why Plaintiff alleges she qualifies for long-term care insurance.

lay witnesses and a copy of documents that may be used to support their claims or defenses. Fed. R. Civ. P. 26(a)(1)(A). Rule 26(a)(2), Fed. R. Civ. P., requires parties to disclose the identity of each expert witness, "accompanied by a written report prepared and signed by the witness," by a date set by the Court. Fed. R. Civ. P. 26(a)(2)(A)-(C). Rule 37(c)(1) "gives teeth to these requirements" by forbidding the use of any improperly disclosed information in a motion, at a hearing, or at trial. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *see also* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information"). Courts have excluded evidence, including witness testimony, under Rule 37(c)(1) "even when a litigant's entire cause of action or defense has been precluded." *Yeti by Molly, Ltd.*, 259 F.3d at 1106.

Two exceptions "ameliorate the harshness of Rule 37(c)(1)." *Id.* The material may be used if the party's failure to properly disclose was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). The party making the late disclosure bears the burden of establishing that the failure to disclose was substantially justified or harmless. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008) ("[T]he burden is on the party facing the sanction . . . to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless."). Rule 37(c) is intended to be a "self-executing, automatic sanction to provide [] a strong inducement for disclosure of material." *Yeti by Molly, Ltd.*, 259 F.3d at 1106 (citing Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment) (quotations omitted).

### B.   *Daubert*

A party offering expert testimony must establish that the testimony satisfies Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case..

Fed. R. Evid. 702.

As gatekeepers, trial judges make a preliminary assessment about the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. To meet the requirements of Rule 702, an expert must be qualified, his opinion must be based on sufficient facts or data and is the product of reliable principles and methods, and his testimony must fit the case such that the expert's opinion is relevant. *Id.* at 589-95.

The Rule 702 inquiry is "flexible." *Id.* at 594. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Because the requirements of Rule 702 are conditions for determining whether expert testimony is admissible, a party offering expert testimony must show by a preponderance of the evidence that the expert's testimony satisfies Rule 702. Fed. R. Evid. 104(a); *see also Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## III.   DISCUSSION

### A.   Defendant's Motion to Strike

Defendant moves to strike three items from Plaintiff's evidence, arguing that Plaintiff improperly disclosed these only days prior to the close of fact discovery: (1) Laura Parker's supplemental report, (2) lay witnesses Tom Finkelstein, Karin Finkelstein, and Bill Mayes, and (3) deposition transcripts from *Turley v. Prudential*. (Doc. 259 at 1-3.) The Court addresses each in turn.

#### 1.   Laura Parker's Supplemental Report

Plaintiff argues that Laura Parker's supplemental report was necessary because

Defendant expanded the subject of Ms. Parker's opinion during her deposition and because Defendant failed to produce Nurse Acosta for deposition in a timely manner. (Doc. 295 at 10-12.) Moreover, Plaintiff believed she was obligated to supplement the report in good faith under the rules, especially because her counsel stated on the record during the deposition that they would do so. (*Id.*) Defendant contends that the late disclosure of the supplemental report is neither substantially justified nor harmless because the Nurse Arroyo deposition was taken in February 2023 whereas Laura Parker's deposition was in March 2023, and Plaintiff did not provide the supplemental report until May 9, 2023. (Doc. 259 at 10.)

The Court finds that Plaintiff's disclosure of Ms. Parker's supplemental report was substantially justified. Plaintiff submitted the report before the close of discovery, and only supplemented the report because Defendant questioned Ms. Parker for over seven hours and introduced Nurse Arroyo's deposition as an exhibit during the deposition. (Doc. 295-6 at 1, 3.) Thus, Defendant's questioning expanded Ms. Parker's conclusions and Plaintiff was required under Rule 26(e)(2) to supplement them. The Court also credits Plaintiff's argument that she had an unusually difficult time scheduling Nurse Arroyo's deposition because Defendant did not produce Nurse Arroyo for deposition. Had Defendant facilitated Plaintiff's deposition of Nurse Arroyo in a timely manner, the deposition may have been available before Ms. Parker's original expert report was prepared and submitted. Moreover, that Defendant deposed Ms. Parker in such a manner that caused an expansion of her opinions, including about Nurse Arroyo's competing opinion, weighs in favor of allowing the supplemental report. (*See* Doc. 23 at 3-4¶ 4(g) ("The Court notes, however, that it may permit parties to present opinions of their experts that were elicited by opposing counsel during depositions of the experts. Counsel should depose experts with this fact in mind.").)

## 2.    Lay Witnesses

Defendant asks the Court to preclude Plaintiff from calling Tom and Karin Finkelstein and Bill Mayes to testify at trial because Plaintiff did not disclose them as witnesses until one day before the close of discovery. As stated on the record at oral

argument, the Court will allow Tom and Karin Finkelstein and Bill Mayes to testify and will allow Defendant to depose these witnesses, should this case proceed to trial. (*See* Doc. 321.) Defendant may raise this issue at the trial-setting conference, if necessary.

### 3. *Turley* Depositions

Defendant seeks to preclude Plaintiff from using deposition transcripts taken during the pendency of *Turley v. Prudential*, a similar breach of contract case against Defendant in California, arguing that Plaintiff improperly disclosed them just one day before the close of fact discovery. Plaintiff argues that its late disclosure of these documents is substantially justified and harmless because Plaintiff originally requested these documents from Defendant during discovery, but Defendant refused to produce them. Plaintiff only disclosed these documents in support of her case after she received them from a third party. Because Defendant was a party to these depositions, Plaintiff contends that there is no harm to Defendant by their disclosure in this case. Plaintiff also argues that any motion to strike these deposition transcripts is premature, and Defendant should assert its objections as to their admissibility as this case gets closer to trial.

The Court agrees with Plaintiff and will deny Defendant's motion as to the *Turley* depositions. The deponents in the disclosed depositions are Defendant's corporate representatives that sat for a 30(b)(6) deposition in another case. Thus, Defendant has independent knowledge of these depositions and their disclosure late in discovery is harmless. Should Defendant seek to argue that these documents are irrelevant or inadmissible at trial, Defendant is free to re-assert those arguments in a motion in limine or when Plaintiff seeks to introduce them at trial.

Accordingly, the Court denies Defendant's Motion to Strike (Doc. 259) in all respects.

### B. *Daubert* Motions

Both parties have moved to exclude one another's experts. Plaintiff moves to exclude or limit the opinions of Defendant's experts: Drs. Lorne Label and Abraham Jacob. Defendant opposes each motion. Defendant, in turn, moves to exclude or limit the opinions

of Plaintiff's experts: Drs. Michael D. Freeman, Mark Reiser, Dan Heffez, Kamran Samakar, and Constantine Moschonas, and Elliott Flood and Laura Parker. Like Defendant, Plaintiff opposes each motion.

### 1.     Dr. Lorne Label

Defendant retained Dr. Lorne Label, a neurologist, to rebut the conclusions of many of Plaintiff's experts and offer opinions on various topics related to the case. Plaintiff seeks to preclude Dr. Label's opinion and testimony on: (1) Meniere's disease; (2) Chiari malformation; (3) somatization disorders; (4) life expectancy and co-morbidity; (5) the qualifications of a general surgeon; and (6) long-term care insurance policy interpretations. (Docs. 266, 267, 268, 269.) The Court will first address Plaintiff's motion to exclude testimony related to Meniere's Disease, Chiari malformation, and somatization disorders, and then will address the remainder of the motions separately.

### a.     Meniere's Disease

Plaintiff does not contest that Dr. Label is knowledgeable and an expert in his field of neurology. Instead, Plaintiff claims that Dr. Label is unqualified to opine on Meniere's disease. (Doc. 266 at 2.) Plaintiff also argues that Dr. Label's testimony about Meniere's disease would be cumulative if Dr. Jacob also opines on the same issue, and as such, should be excluded. (*Id.*)

Courts typically do not require that an expert be a specialist, but instead require that the expert "be of a certain profession, such as a doctor." *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992). Further, lack of specialized knowledge impacts the weight of the expert's testimony, not the admissibility of the testimony. *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993); *see also In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 899 (C.D. Cal. 2004) ("A court abuses its discretion when it excludes expert testimony solely on the ground that the witness's qualifications are not sufficiently specific if the witness is generally qualified. A lack of specialization affects the weight of the expert's testimony, not its admissibility." (internal citations omitted)).

Dr. Label meets the requirement to opine as a medical expert and to discuss his

experience with Meniere's disease. In his practice as a neurologist, Dr. Label has treated hundreds of patients with Meniere's disease. (Doc. 285-1 at 8.) Plaintiff, however, claims that Dr. Label stated in his deposition that he is not an expert in Meniere's disease. (Doc. 266 at 1-2.) The Court finds that Plaintiff mischaracterizes Dr. Label's testimony. Dr. Label said he is not an expert in Meniere's disease in the context that he is not a neurosurgeon and does not specialize in that disease. (Doc. 266-1 at 6.) Dr. Label further clarifies that he can care for and treat patients with Meniere's disease. (*Id.*) Plaintiff's arguments ultimately go to the weight of the evidence, not its admissibility. *See Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1028 (E.D. Cal. 2011) ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility" (quoting *Robinson v. GEICO Gen. Ins. Co.*, 477 F.3d 1096, 1100 (8th Cir. 2006)).

If Dr. Jacob testifies about Meniere's disease, however, Dr. Label will be precluded from also doing so. (*See* Doc. 23 at 4 ¶ 4(h) (stating that "[e]ach side shall be limited to one retained or specifically employed expert witness per issue").) Dr. Label testifies that he would "defer" to Dr. Jacob about Plaintiff's Meniere's disease diagnosis because Dr. Jacob performs surgery on patients with Meniere's disease. (Docs. 266 at 2, 266-1 at 6.) This is an issue for motions in limine and not appropriate at this stage. The Court therefore denies Plaintiff's motion to exclude Dr. Label with respect to Meniere's disease (Doc. 266 at 1- 2).

### b.      Chiari Malformation

Plaintiff similarly argues that Dr. Label claims he is not an expert in Chiari malformations. (Doc. 266 at 3.) Defendant argues that Dr. Label is an expert with relevant experience with Chiari malformations. (Doc. 285 at 2-3.)

As discussed, Dr. Label need not be a specialist to qualify an expert. *See Doe*, 971 F.2d at 385. Defendants established that Dr. Label is knowledgeable and an expert in his field. In addition, Dr. Label has reviewed hundreds of MRIs with Chiari malformations. (Doc. 285-1 at 11.) Plaintiff claims that Dr. Label said he is not an expert in Chiari

1    malformations. (Doc. 266 at 1-4.). But Dr. Label said he is not an expert in Chiari
2    malformations in the context that he is not a neurosurgeon and does not specialize in that
3    disease. (Doc. 266-1 at 1, 3-4.) Dr. Label explains that he has had patients with Chiari
4    malformations and referred many of them to neurosurgeons for treatment. (Doc. 285-1 at
5    11.) Therefore, as a neurologist, Dr. Label may opine on Chiari malformations, subject to
6    the proper foundation and any cross-examination or impeachment at trial. Defendant can
7    address its concerns with the weight of the testimony through cross-examination. *See*
8    *Daubert*, 509 U.S. at 596. The Court therefore denies Plaintiff's motion to exclude Dr.
9    Label with respect to Chiari malformation (Doc. 266 at 2-4).

10                          **c.      Somatization Disorders**

11           Plaintiff argues that Dr. Label is not an expert in somatization disorder because he
12   admitted that he is not, and he has not published about or researched this condition. (Doc.
13   266 at 4.) Plaintiff also argues that the Court should prohibit Dr. Label from testifying
14   about somatization disorders under Rule 403 because it will confuse and mislead the jury.
15   (*Id.* at 5.) Defendant claims that Dr. Label is an expert because he has treated and diagnosed
16   patients with somatization disorder. (Doc. 285 at 3.)

17           Dr. Label has diagnosed hundreds of patients with somatization disorder. (Doc. 285-
18   1 at 10.) The Court, however, cannot find a basis in the record for Dr. Label's opinions
19   related to whether Plaintiff has somatization disorder. Dr. Label has not examined Plaintiff
20   for this disorder, nor has another physician diagnosed her with this condition. As such, the
21   Court agrees that Dr. Label's testimony would mislead a jury and that this evidence should
22   be excluded. *See Daubert*, 509 U.S. at 595 ("Throughout, a judge assessing a proffer of
23   expert scientific testimony under Rule 702 should also be mindful of other applicable
24   rules."); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value
25   is substantially outweighed by a danger of one or more of the following: unfair prejudice,
26   confusing the issues, misleading the jury, undue delay, wasting time, or needlessly
27   presenting cumulative evidence."). The Court therefore grants Plaintiff's motion to exclude
28   Dr. Label's testimony with respect to somatization disorders (Doc. 266 at 4-5).

### 2.     Dr. Abraham Jacob

Defendant also retained Dr. Abraham Jacob, a neurotologist with a subspecialty in otolaryngology, to rebut the conclusions of many of Plaintiff's experts and offer opinions on various topics related to the case. Plaintiff seeks to preclude Dr. Jacob's opinion and testimony on: (1) life expectancy and co-morbidity; (2) the standard qualifications of a general surgeon; (3) long-term care insurance policy interpretations; and (4) Chiari malformations and "any topics outside the bounds of his expertise on Meniere's disease." (Docs. 267, 268, 269, 270.) The Court will address Dr. Jacob's opinions on Chiari malformations and "any topics outside the bounds of his expertise on Meniere's disease" first, (*see* Doc. 270 at 1), and then, will address the remainder of the motions separately with reference to Dr. Label below.

Plaintiff argues that Dr. Jacob does not have experience treating Chiari malformations. (*Id.* at 2.) Plaintiff also argues his report is unreliable and incomprehensible, making it difficult to differentiate between Dr. Jacob's opinions and others' opinions. (*Id.* at 1-5.) Defendant contends that Dr. Jacob is qualified to testify because he is a neurotologist and is not required to be a specialist. (Doc. 286 at 3- 4.) Defendant maintains that Dr. Jacob's report is well-organized with headings and subheadings differentiating between Dr. Jacob's opinion from others. (*Id.* at 2-3.)

Plaintiff bases her complaints about Dr. Jacob's specialized expertise in Chiari malformations on cases outside the Ninth Circuit that require physicians to be a specialist in performing the medical care at issue. (Dofc. 270 at 8.) For example, Plaintiff cites *Tanner v. Westbrook*, 174 F.3d 542, 528 (5th Cir. 1999), which held the testimony unreliable when the physician "did not have the kind of specialized knowledge required to testify" regarding an issue in a case. (Doc. 270 at 8.) Plaintiff also cites *Kallassy v. Cirrus Design Corp.*, No. Civ.A. 3:04-CV-0727N, 2006 WL 1489248, at *7 (N.D. Tex. 2006), which held that an orthopedic surgeon did not qualify as an expert to determine the cause of Plaintiff's nervous system disorder. (*Id.*) These examples, however, do not apply here. As discussed, courts in this Circuit do not require that an expert be a specialist, but instead

require that the "expert be of a certain profession." *Doe*, 971 F.2d at 385. Further, lack of specialized knowledge impacts the weight of the expert's testimony, not the admissibility of the testimony. *Garcia*, 7 F.3d at 890; *BBK Tobacco & Foods LLP v. Cent. Coast Agric. Inc.*, 615 F. Supp. 3d 982, 1005-06 (D. Ariz. 2022).

Defendants established that Dr. Jacob is knowledgeable and experienced in his field of neurotology. Dr. Jacob is board certified in both otolaryngology and neurotology cranial-based surgery, and currently serves as the medical director of otology, neurotology, and audiology for Tucson Medical Center. (Doc. 267-7 at 2; Doc. 270-1 at 1; Doc. 286-1 at 6.) In addition, Dr. Jacob has reviewed imaging for patients with Chiari malformation. (Doc. 286-1 at 9.) Thus, Dr. Jacob may offer opinions about Plaintiff's medical conditions based on that medical experience and knowledge. *See, e.g.*, *Doe*, 971 F.2d at 385 (concluding that "[t]he fact that the [virologist and infectious disease specialists] were not licensed hematologists does not mean that they were testifying beyond their area of expertise"); *Fowler v. Wal-Mart Stores, Inc.*, No. 2:16-CV-450-JCM-GWF, 2017 WL 8682353, at *3 (D. Nev. Nov. 14, 2017) (holding that a neurologist "need not be an expert specifically in orthopedic surgery in order to be of assistance to a jury as to the medical issues presented").

Moreover, Dr. Jacob's report does not appear incomprehensible and unreliable. Dr. Jacob's opinions are labeled throughout the 40-page report. (*See* Doc. 270-1.) In the records review section, Dr. Jacob labels his own opinion in capital letters and bold text with the word "**OPINION**." (*Id.* at 16-29.) With each expert he reviews, Dr. Jacob identifies his opinion with the statement "I reviewed the transcript and exhibits in their entirety and have the following comments and opinions." (*Id.* at 29-41.) Plaintiff's arguments ultimately go to the weight of the opinions, not its admissibility. *See Daubert*, 509 U.S. at 596. As such, Plaintiff may test the limitations of Dr. Jacob's opinions and attempt to discredit them at trial. *See id.* To the extent that Plaintiff argues Dr. Jacob provided new opinions during deposition, Plaintiff elicited that testimony so the Court will not exclude it merely because it is not in Dr. Jacob's report. (*See* Doc. 23 at 3-4 ¶ 4(g).)

1    The Court therefore denies Plaintiff's motion to exclude Dr. Jacob's testimony with

2    respect to Chiari malformations and "any topics outside the bounds of his expertise on

3    Meniere's disease" (Doc. 270).

### 3.    Life Expectancy and Co-Morbidity

5    Plaintiff retained Dr. Michael D. Freeman, a forensic medicine and forensic

6    epidemiology expert, to opine about Plaintiff's life expectancy. Defendant offers Drs.

7    Label and Jacob to rebut Dr. Freeman's testimony. Plaintiff argues that neither Dr. Label

8    nor Dr. Jacob should opine as to Plaintiff's life expectancy or co-morbidities under Rule

9    702 because neither are qualified to discuss these issues. (Doc. 267.) Plaintiff claims that

10    Drs. Label and Jacob are not experts in forensic medicine or epidemiology, and as such,

11    have improperly offered opinions criticizing Dr. Freeman's opinions. (Doc. 267 at 1, 5-6.)

12    Plaintiff also argues that, even if both physicians are qualified, both cannot testify because

13    the Scheduling Order limits each party to only one independent expert per issue. (Doc. 267

14    at 6.) Defendant argues that these experts may properly criticize Dr. Freeman's opinions

15    by showing that he failed to account for certain risk factors. (Doc. 287 at 1-2.) Defendant

16    also argues that Plaintiff's concerns address the weight of the testimony, not admissibility.

17    (*Id.* at 4.) Finally, Defendant contends that Plaintiff's cumulative testimony argument is

18    premature. (*Id.*)

19    Under Rule 26(a)(2)(D)(ii), Fed. R. Civ. P., parties may offer testimony "intended

20    solely to contradict or rebut evidence on the same subject matter identified by another

21    party." *Id.* A rebuttal expert critiques methodologies and opinion of the other party's expert

22    to identify flaws in that expert's opinion. *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,

23    829 F. Supp. 2d 802, 834-35 (D. Minn. 2011). As such, a rebuttal expert's report and

24    testimony "are subject to exclusion if they are not proper rebuttal." *People v. Kinder*

25    *Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1191 (S.D. Cal. 2016).

26    Here, as explained later in Part III.B.6 of this Order, Dr. Freeman is excluded as an

27    expert because his report is unreliable. Therefore, the need for Drs. Label's and Jacob's

28    rebuttal of Dr. Freeman's life expectancy and co-morbidity testimony no longer exists. The

1   Court therefore grants Plaintiff's motion to exclude life expectancy and co-morbidity
2   testimony (Doc. 267).

### 4.     General Surgeon Qualifications

4   Plaintiff retained Dr. Kamran Samakar, a general surgeon, to rebut Dr. John David
5   Nye, a general surgeon retained by Defendant. Defendant attempts to use Drs. Label and
6   Jacob to rebut Dr. Samakar's testimony. Plaintiff seeks to exclude Dr. Label and Dr. Jacob
7   from opining about the general qualifications of a surgeon under Rule 702. (Doc. 268.)
8   Plaintiff claims that Dr. Label, a neurologist, and Dr. Jacob, an otolaryngologist, are not
9   qualified to counter Dr. Samakar's opinions about Dr. Nye's testimony because they lack
10  the training and knowledge of general surgeons' standards of care. (*Id.*) Defendant argues
11  that Drs. Label and Jacob are qualified to offer opinions about the general capabilities of
12  other doctors. (Doc. 284 at 2.) Specifically, Drs. Label and Jacob do not opine about
13  general surgery, but instead about the qualifications of all physicians to review and
14  understand a patient's medical records, evaluate a patient's physical functioning, and
15  research medical conditions. (*Id.* at 2-3.)

16  The Court agrees that Drs. Label and Jacob, as physicians, are qualified to opine
17  about the medical field and the qualifications of another physician. *See Doe*, 971 F.2d at
18  385. Drs. Label and Jacob, however, are not qualified to opine about Dr. Samakar's
19  opinions as to Dr. Nye's qualifications because they did not review any of Dr. Nye's
20  testimony. To critique Dr. Samakar's opinion, Drs. Label and Jacob must also be familiar
21  with Dr. Nye's testimony. *See* Fed. R. Evid. 702 ("the testimony is based on sufficient facts
22  or data"). In Drs. Label's and Jacob's deposition, they both admit to (1) not having any
23  knowledge about Dr. Nye's particular qualifications, (2) not reading Dr. Nye's deposition,
24  and (3) not knowing the standards of general surgeons. (Doc. 268-2 at 4-8; Doc. 268-4 at
25  3-7.) The Court therefore grants Plaintiff's motion to exclude testimony on standards of a
26  general surgeon (Doc. 268).

### 5.     Insurance Policy Interpretations

28  Plaintiff seeks to exclude Drs. Label and Jacob from opining about what the

insurance policy requires. (Doc. 269.) Plaintiff argues that, because interpretation of the insurance policy is the crux of whether Plaintiff qualifies for the long-term care insurance, Drs. Label and Jacob as non-insurance policy experts should not opine on this legal issue. (Doc. 269 at 1-2.) Defendant claims that Drs. Label and Jacob will not offer legal opinions about insurance policies, but instead, offer testimony about whether Plaintiff can perform activities of daily living ("ADLs"). (Doc 283.)

Expert witnesses cannot give opinions about their legal conclusions because "instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys. Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)). Courts typically prohibit experts from interpreting the law and advising how the law should apply to the facts of a case because this testimony can circumvent the fact-finder's decision-making capability. *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042 (D. Ariz. 2005). Insurance policy interpretation is a matter of law for the Court, meaning that expert "testimony cannot be used to provide legal meaning or interpret the policies as written." *McHugh v. United Servs. Auto. Ass'n.*, 164 F.3d 451, 454 (9th Cir. 1999).

Both physicians used the insurance policy to arrive at their conclusions. In his report, Dr. Label used the insurance policy handbook to define ADLs and identify the types of activities he believed fell under that definition. (Doc. 269-1 at 4, 9, 11.) In his deposition, Dr. Label opines that, under the policy, Plaintiff would "require assistance with two of her ADLs for at least three months in order to qualify." (Doc. 269-2 at 7.) He also states that Plaintiff does not qualify in part "because she didn't need any assistance with any of the six ADLs[,] . . . [and] there were no consistent days." (*Id.* at 8-9.)

Dr. Jacob refers to the long-term care policy to develop a definition of "substantial assistance" and explains what he thinks falls under that definition. (Doc. 269-4 at 4, 7, 35, 38, 40-41.) In his report, Dr. Jacob opines that "[Plaintiff's] level of function on asymptomatic or hypo-symptomatic days does *not* require her to have 'substantial

assistance' whether 'hands-on assistance' or 'stand-by assistance' to perform [her ADLs]."
(*Id.* at 6-7 (emphasis in original).) Dr. Jacob further opines that "needing assistance from a walker does not make her eligible for benefits under her long-term care policy. The assistance needed is 'substantial assistance' either 'hands-on' or 'stand-by,' from a person [and] not a device." (*Id.* at 35.) In his deposition, Dr. Jacob further explains that "his understanding is that she needs to have —needs that assistance for 90 days" and that "she did not need a 90-day consecutive hands-on or standby assistance for that ADL, and, therefore, she would not qualify for benefits." (Doc. 269-5 at 5.)

The Court precludes Drs. Label and Jacob from offering any expert opinions that interpret the Plaintiff's insurance policy or that her health conditions do not qualify her for benefits under the policy. *See Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892 (9th Cir. 1993) (holding exclusion of insurance expert's interpretation of "hostile fire" under the insurance policy was proper because the testimony was an unsupported legal conclusion); *see also Chale v. Allstate Life Ins. Co.*, 353 F.3d 742, 749 (9th Cir. 2003) ("Although testimony from medical experts can help inform the legal decision maker about the nature of these afflictions, it does not dictate the proper legal interpretation of this policy term."). Drs. Label's and Jacob's testimony shall be limited to Plaintiff's medical conditions and how these affect her abilities, but they must omit discussion about how this affects her ability to secure insurance benefits or relay their opinions using policy terms.

The Court therefore grants in part, as discussed herein, Plaintiff's motion to exclude this testimony on policy interpretations (Doc 269).

### 6.    Dr. Michael D. Freeman

Plaintiff retained Dr. Michael D. Freeman, an epidemiology expert, to opine about Plaintiff's life expectancy. Defendant moves to exclude his opinions and testimony for three reasons. (Doc. 260.) First, Dr. Freeman "relies on insufficient data and ignores [Plaintiff's] specific health conditions and risk factors that impact her life expectancy." (*Id.* at 2.) Second, Dr. Freeman based his opinion on outdated life tables from 2019. (*Id.*) And finally, his testimony would not help a trier of fact because it simply restates verbatim the

1  average life expectancy shown in the 2019 CDC life table. (*Id.*)

2       Defendant does not dispute Dr. Freeman's qualifications as an expert, but disputes

3  the methodology used in his report. Courts find expert testimony admissible when the

4  witness employs reliable principles and methods and applies those principles and methods

5  to the facts of the case. *Daubert*, 509 U.S. at 589; *see also* Fed. R. Evid. 702. In his report,

6  Dr. Freeman opines that Plaintiff is expected to live to be 85.4 years old because she does

7  not have any co-morbidities that would affect her life expectancy outside of what an

8  average person faces. (Doc. 260-1 at 1, 3-5.) Defendant argues that Dr. Freeman's report

9  is unreliable because he failed to address Plaintiff's artery disease, hypertension, obesity,

10  opioid use disorder, and other risk factors that would affect her life expectancy. (Doc. 260

11  at 8-9.) Defendant also argues that Dr. Freeman materially changed his opinion from

12  "Plaintiff has no co-morbidities" to "Plaintiff has no co-morbidities that would affect her

13  life expectancy." (Doc. 307 at 5.) Plaintiff argues that Dr. Freeman addressed in his

14  deposition how these other chronic conditions impact life expectancy. (Doc. 292 at 5-6.)

15  Plaintiff also contends that Dr. Freeman is the only expert able to opine about life

16  expectancy to the jury. (*Id.* at 9-10.)

17       The Court finds Dr. Freeman's report unreliable because it fails to explain in detail

18  his methodology for including Plaintiff's various conditions into the calculation for

19  Plaintiff's life expectancy. *See, e.g.*, *Noon v. Carnival Corp.*, No. 18-23181-CIV, 2019 WL

20  5784689, at *4-*5 (S.D. Fla. Nov. 6, 2019) (excluding expert's life expectancy calculation

21  based on government life expectancy tables when the report failed to explain how it

22  accounted for patient's COPD and not her "tobacco abuse, hyperlipidemia, Type 2

23  diabetes, migraines, and asthma"); *Rinker v. Carnival Corp.*, No. 09-23154-CIV, 2012 WL

24  37381, at *1-*2 (S.D. Fla. Jan. 6, 2012) (excluding expert's life expectancy calculation that

25  concluded 62-year-old patient's life expectancy would be equal to that of a health 62-year-

26  old woman when the report failed to explain how it accounted for her stage three colon

27  cancer diagnosis).

28       *Daubert*'s gatekeeping requirement "ensures the reliability and relevancy of expert

testimony" by "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Dr. Freeman's report does not satisfy this standard. Like the expert reports in *Noon* and *Rinker*, Dr. Freeman's report does not provide a detailed description of his methodology to explain how his calculation of Plaintiff's life expectancy differs from the average life expectancy from the 2019 CDC life tables. In his report, Dr. Freeman concludes that Plaintiff's life expectancy is 85.4 years old, which is "equivalent to the national average, and is likely conservative given the lack of significant comorbidities associated with decreased life expectancy" and "despite her Meinere's disease." (Doc. 260-1 at 1.) His report identifies Meniere's disease, Chiari malformation, hearing loss, tinnitus, decreased range of motion in her cervical spine, and ulnar neuropathy as "potentially relevant diagnoses, with regard to [Plaintiff's] life expectancy." (*Id.* at 3). Dr. Freeman's report, however, only explains how Meniere's disease affects her life expectancy and does not detail any others. (*See id.* at 1-6.)

Not until his deposition does Dr. Freeman provide detail about his methodology. He explains that he used Plaintiff's medical records to identify Plaintiff's diagnosed diseases and the lack of chronic conditions factored into his assessment. (Doc 292-4 at 10-11.) He also explains that Plaintiff's hypertension does not impact life expectancy because it is controlled (rather than uncontrolled), which is why he excluded it from the calculation. (*Id.* at 3-4.) In addition, Dr. Freeman opines that large proportions of the population in Plaintiff's age group already have conditions such as obesity, so he did not reduce the life expectancy from that of the general tables because the general calculation accounts for this. (*Id.*) Parties, however, under Rule 26(a)(2), Fed. R. Civ. P., may not "cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008); *see also Goodman v. Staples The Off. Superstore, LLC* 644 F.3d 817, 825 (9th Cir. 2011) ("[P]ermitting treating physicians to testify in all circumstances without providing expert reports would circumvent the policies underlying

Rule 26(a)(2)(B)" (citing *Fielden v. CSX Transp., Inc.*, 482 F.3d 866 (6th Cir. 2007))). Even though Dr. Freeman is the only expert with the expertise to opine about life expectancy, his report fails to meet to reliability standards under *Daubert*.

The Court therefore grants Defendant's motion to exclude Dr. Freeman (Doc. 260).

### 7.     Mark Reiser, PhD

Plaintiff engaged Dr. Mark Reiser to opine about the damages owed to Plaintiff. Defendant moves to exclude Dr. Reiser's opinions and testimony in its entirety. (Doc. 260.) First, Defendant argues that Dr. Reiser's report fails to meet the requirements of Rule 26 because his report does not provide a "standard formula" nor a basis for his opinions. (Doc. 260 at 11-12.) Second, Defendant argues that Dr. Reiser's calculation is unreliable because it is based off Dr. Freeman's life expectancy calculation. (*Id.* at 13.) Finally, Defendant argues that Dr. Reiser's opinions are independently inadmissible because his alternative future benefit calculations from ages 85.4 to 95 are arbitrary and speculative. (*Id.* at 13-14.) Plaintiff responds that no prejudice exists for any Rule 26 violations because Defendant failed to raise the issue sooner. (Doc. 292 at 12-13.) Plaintiff, however, agrees to withdraw the projections from ages 85.4 to 90. (*Id.* at 13-14.).

The Court agrees that Dr. Reiser's two-page report fails to provide the detail required for a reliable report. Plaintiff admits that she failed to include Dr. Reiser's schedule for past-due benefits and schedule for future benefit calculations to the original two-page report. As such, the late disclosure of the scheduling tables, violating Rule 26, means that these tables shall be excluded. *See* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required under Rule 26(a) . . . the party is not allowed to use that information"). Even though Dr. Reiser's report does not contain the schedule tables, his report explains his calculation by identifying the different variables and adjustments. (*Id.*) Nonetheless, because Dr. Reiser's calculations rely on Dr. Freeman's unreliable life-expectancy calculation, the Court finds Dr. Reiser's report also unreliable. *See Kumho Tire Co.*, 526 U.S. at 152 (stating that *Daubert*'s gatekeeping requirement "ensure[s] the reliability and relevancy of expert testimony" by "mak[ing]

certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

The Court therefore grants Defendant's motion with respect to Dr. Reiser's opinion (Doc. 260.).

### 8.     Dan Heffez, M.D.

Plaintiff retained Dr. Dan Heffez, an expert in neurosurgery, to rebut to Defendant's Drs. Lorne Label's and Abraham Jacob's conclusions and provide his own opinion about the cause of Plaintiff's medical symptoms. (Doc. 291.) Defendant seeks to exclude Dr. Heffez's opinions and testimony because (1) his report contains speculative opinions and vague statements, (2) he does not follow his own prescribed methodologies, and (3) he improperly discloses a new opinion about Plaintiff's cervical stenosis. (Doc. 261.) Plaintiff argues that Dr. Heffez's expert opinions fall within the type of medical opinions routinely admitted in federal court. (Doc. 291.)

### a.     Report's Reliability

Defendant does not dispute that Dr. Heffez is qualified as a medical expert. Instead, Defendant argues that Dr. Heffez's report and testimony are unreliable. Specifically, Defendant claims that Dr. Heffez's opinion about Plaintiff's Chiari malformation diagnosis is speculative because he fails to rely on his own published methodology and uses "vague and speculative opinions." (Doc. 261 at 4-7.)

When an expert's testimony relies heavily on the expert's knowledge and experience, rather than scientific methodology, the *Daubert* factors are not applicable. *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). "Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting Harrison's Principles of Internal Medicine 3 (Dennis L. Kasper et al. eds., 16th ed. 2005)). A court therefore may admit medical expert testimony "if physicians would accept it as useful and reliable" and the medical knowledge provides

a "reasonable opinion." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

Defendant's argument that Dr. Heffez failed to use his own "methodology" to evaluate Plaintiff is misguided. Dr. Heffez previously conducted a peer-reviewed study where he talked to and physically examined the patients, in addition to reviewing their medical records. (Doc. 291-3 at 6-7.) Dr. Heffez is not required to replicate this methodology. Medical experts may rely on their own clinical expertise to draw conclusions after reviewing a patient's medical records. *See McClellan v. I-Flow Corp.*, 710 F.Supp. 2d 1092, 1137-38 (D. Or. 2010). Dr. Heffez report explains that he reviewed Plaintiff's medical records, Drs. Label's and Jacob's reports, and identified a number of other expert reports, declarations, and depositions before drafting his report. (Doc. 261-1 at 2.) He states that he formulated his opinions using his "education, training, and experience as a board-certified neurological surgeon with specific expertise with Chiari [m]alformations." (*Id.*) Using his experience and knowledge as a physician, Dr. Heffez provides detailed explanations in the report and during the deposition for his findings. For example, he opines that the MRI imaging of the "axial view through the plane of the foramen magnum" shows brain stem compression and "[b]ased on the brain stem compression evident on her MRI imaging studies, [Plaintiff's] Chiari malformation" can explain her symptoms. (*Id.* at 2, 5.) In the deposition, Dr. Heffez states again that "[t]he only images that can show [brain stem compression] are the axial images through the plan of the foramen magum, both T1 and T2." (Doc. 291-3 at 2.) The Court therefore finds Dr. Heffez's opinion reliable.

### b. Cervical Stenosis

Defendant claims that Dr. Heffez offers a new opinion, rather than a rebuttal opinion, that Plaintiff has cervical stenosis. (Doc. 261 at 7-8.) Defendant also argues that this new opinion is an untimely disclosure, violating the initial expert disclosure deadline of November 18, 2022. (*Id.*)

Defendant misconstrues Dr. Heffez's explanation for providing the cervical stenosis opinion. Dr. Heffez's report is a rebuttal to Drs. Label and Jacob. Dr. Label's report from

December 21, 2022, which states, "Based on my review of the materials provided, [Plaintiff] shows symptoms of . . . [d]egenerative cervical spine disease with foraminal stenosis without myelopathy" that does not require the need for assistance with ADLs. (Doc. 291-5 at 7-8.) Dr. Heffez's rebuttal report from February 22, 2023, provides a contrary opinion that Plaintiff "has cervical stenosis, which can contribute to vertigo and balance disturbances in conjunction with the Chiarai Malformation," which together the "impact [to the Plaintiff] can be additive." (Doc. 261-1 at 5.) Dr. Heffez states that his opinion regarding cervical stenosis his own opinion but that it "is completely contrary to [Drs. Label and Jacob]." (Id.) In addition, Defendant had an opportunity to respond to Dr. Heffez's opinion. Dr. Label testifies that he read Dr. Heffez's report and could have replied to Dr. Heffez's cervical stenosis conclusion then but did not do so. (Doc. 291-2 at 4, 6-10.) The Court finds that because Dr. Heffez's opinion rebuts Dr. Label's opinion, it is not an untimely expert disclosure.

The Court therefore denies Defendant's motion to exclude Dr. Heffez (Doc. 261).

### 9.      Dr. Constantine Moschonas

Plaintiff disclosed Dr. Constantine Moschonas, her treating neurologist, as a non-retained expert witness. Defendant seeks to exclude the opinions and testimony of Dr. Moschonas. (Doc. 262.) At the time of the declaration, Dr. Moschonas had been treating Plaintiff with respect to her Meniere's disease for almost fourteen years. (Doc. 262-1 at 3.) Defendant does not contest that Dr. Moschonas is a qualified expert. Instead, Defendant argues Dr. Moschonas' opinions about (1) Plaintiff's ability to perform ADLs, (2) the Plaintiff's treatment, and (3) Plaintiff's Chiari malformation exacerbating the effects of her other health conditions are speculative, unsupported, and contradicted by his own medical records and deposition testimony. (Doc. 262 at 4, 5, 7.)

### a.      Performing ADLs

Defendant argues that Dr. Moschonas' opinion that Plaintiff's fear prevents her from performing her ADLs is speculative and contradicted by evidence. (Id. at 4-5.) Defendant claims that these conclusions are speculative because (1) Dr. Moschonas'

treatment records do not discuss Plaintiff's fear of falling, and (2) a video surveillance shows that Plaintiff can lift cases of soda without holding onto her walker. (*Id.* at 5.) Plaintiff argues that Defendant mischaracterizes Dr. Moschonas' testimony about Plaintiff's fear of falling. (Doc. 293 at 5.)

"Despite the importance of evidence-based medicine, much of decision-making relies on judgment—a process that is difficult to quantify or even assess qualitatively." *Primiano*, 598 F.3d at 565 (quoting Harrison's Principles of Internal Medicine 3 (Dennis L. Kasper et al. eds., 16th ed. 2005)). Physicians are expected to use their knowledge and experience to evaluate a patient's symptoms along with uncertainties inherent in medicine to "make a sound judgment." *Id.* Therefore, medical expert testimony should be admitted if other physicians would find it "useful and reliable but it need not be conclusive because medical knowledge is often uncertain." *Id.* at 566 (quoting *Sandoval-Mendoza*, 472 F.3d at 655). When the foundation is sufficient, a jury, rather than a judge, decides the expert's credibility. *Id.* at 566.

Dr. Moschonas clearly opines in his declaration and deposition that Plaintiff needs substantial assistance with ADLs when she experiences vertigo. (Doc. 262-1 at 2-3; Doc. 293-1 at 2-3.) In his declaration, he also states that Plaintiff "does need hands-on assistance with bathing and dressing, and she needs stand-by assistance (which will become hands-on assistance depending on her symptoms that day) with continence, toileting, and transferring." (Doc. 262-1 at 3.) Dr. Moschonas supports these conclusions. He bases his conclusions on his personal observations from treating Plaintiff and experience treating other patients with Meniere's disease. (*Id.* at 1, 3.) Dr. Moschonas opines that these patients struggle with ADLs because of either a conscious or subconscious fear of falling. (Doc. 293-1 at 4.) He explains that on asymptomatic days that Plaintiff can "mechanically" dress herself but that "cognitively" she may struggle because "her brain won't allow her to" as she may be afraid to fall. (Doc. 262-2 at 12-13.) He relied on his experience as a neurologist to reach this conclusion. (Doc. 293-1 at 4.)

Altogether, Dr. Moschonas' declaration and deposition testimony are reliable and

relevant because he relies on his professional experience and treatment of Plaintiff to determine her ability to perform ADLs. *See, e.g.*, *McClellan*, 710 F. Supp. 2d at 1138 (holding physician may draw inferences regarding causes of a condition "such as patient age and surgical error from the medical literature and his extensive experience"). A court's gatekeeping function under *Daubert* is to ensure the reliability and relevance of expert testimony, "whether basing testimony upon professional studies or personal experience." *Kumho Tire Co.*, 526 U.S. at 152.

Defendant's argument about the video surveillance ultimately challenges the credibility of Dr. Moschonas conclusions, rather than the reliability of his expertise. *See Messick v. Novartis Pharmaceutical Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("Remaining issues regarding the correctness of [an expert's] opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility."). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

### b.   Treatment

Defendant argues that Dr. Moschonas "provides the baseless opinion that Plaintiff's 'chronic dizziness and vertigo' are 'incurable' symptoms." (Doc. 262 at 5.) Defendant contends that Dr. Moschonas' opinion is contradicted by medical records and Plaintiff's own expert, neurologist Dr. Heffez, that a treatment to cure Plaintiff's disorders exists. (*Id.*) Defendant uses Dr. Moschonas statement that "we try noninvasive things to help people to *cure and stay stable*" to claim that his testimony is contradictory, false, and misleading. (Doc. 262 at 6 (emphasis added).)

As discussed, physicians are expected to use their knowledge and experience to evaluate a patient's symptoms and conditions to reach their conclusions. *Primiano*, 598 F.3d at 565. Dr. Moschonas states that since 2008, Plaintiff's conditions are only able to be managed, because "they are incurable." (Doc. 262-1 at 3.) In other words, *for this specific patient* the conditions are incurable. During the deposition, Dr. Moschonas explains that he prefers noninvasive treatment methodologies. (Doc. 262-2 at 7-9.)

Specifically, he avoids using a middle ear neurotoxin injection because that kills the nerve and explains that some treatments like surgery may cure but also make symptoms worse. (Doc. 262-2 at 7-9.) Dr. Heffez does state that Plaintiff would be a good candidate for surgery, but he also does not guarantee a cure. (Doc. 262-3 at 3-4.)

"[M]uch of medical decision-making relies on judgment." *Primiano*, 598 F.3d at 565. Courts admit medical expert testimony if other physicians would find it "useful and reliable." *Id.* Dr. Moschonas' declaration and deposition testimony are reliable and relevant because he relies on his professional experience and treatment of Plaintiff's conditions. Defendant may instead critique Dr. Moschonas' treatment of Plaintiff through "vigorous cross-examination" and "presentation of contrary evidence." *See Daubert*, 509 U.S. at 596.

### c.   Chiari Malformation

Defendant argues that Dr. Moschonas changed his opinion from Plaintiff's Chiari malformation has "no clinical significance" to Plaintiff's Chiari malformation does impact Plaintiff's symptoms. (Doc. 262 at 7-8.) Defendant argues that Dr. Moschonas' testimony is unsupported by his medical records, claiming that Dr. Moschonas should have produced a Rule 26(a)(2)(B) report because his opinions did not form during his course of treatment of Plaintiff. (*Id.*)

Rule 26(a)(2), Fed. R. Civ. P., requires parties to disclose expert witnesses and, for retained or specially employed experts, further disclose the expert's written report, which must conform to the requirements under Rule 26(a)(2)(B). Treating physicians, unlike retained medical experts, are not bound by the written expert report requirements under Rule 26(a)(2)(B), but only if their testimony is limited to the opinions formed during treatment of their patient. *Goodman*, 644 F.3d at 826.

Dr. Moschonas' declaration states that Plaintiff's symptoms of "vertigo, dizziness, loss of balance, nausea, and vomiting" are "likely roughly double of what a typical Meniere's-only patient would experience" because she also has Chiari malformation. (Doc 262-1 at 3.) Dr. Moschonas documented that Plaintiff's Chiari malformation was "clinically insignificant" in 2008, when she first became his patient. (*See* Doc. 293-1 at 9.)

During his deposition, Dr. Moschonas explains that in 2008, after Plaintiff had surgery, her Chiari malformation symptoms were "clinically insignificant" because she was asymptomatic at that time. (*Id.* at 14-15.) Defendant claims that Dr. Moschonas offers new opinions for the purpose of litigation. (Doc. 262 at 8.) However, in the deposition after reading aloud one of his treatment notes, Dr. Moschonas further explains that when Plaintiff experiences symptoms from Chiari malformation these can impact her Meiner's disease-related symptoms. (*Id.* at 7-9, 14-16.)

Dr. Moschonas took what he personally observed during Plaintiff's course of treatment and drew on his knowledge and experience as a neurologist to reach his conclusion that Plaintiff's health is also impacted by her Chiari malformation. *See, e.g.*, *Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, 2019 WL 4849482 (D. Ariz. Sept. 30, 2019) (permitting a treating physician to only opinions he formed during his course of the patient's treatment and not to outside scientific conclusions about what caused Plaintiff's injuries). Defendant may test the sufficiency of these opinions and attempt to discredit them at trial using its own evidence and expert witnesses. *See Daubert*, 509 U.S. at 596.

Plaintiff also objects to Defense Counsel Raina Shipman's declaration in support of Defendant's Motion to Exclude Dr. Moschonas' opinions as inadmissible. (Doc. 293 at 10-12.) Plaintiff argues Ms. Shipman does not have personal medical knowledge or experience to interpret the medical records and reach conclusions. (*Id.*) An attorney may submit a declaration as evidence to support a motion but it "must be made upon personal knowledge and sets forth fact[s] that would [be] admissible in evidence if the attorney were testifying at trial." *Clark v. Cnty. of Tulare*, 755 F.Supp. 2d 1075, 1083 (E.D. Cal. 2010). Ms. Shipman declares that "nothing in these treatment records indicat[e] that Plaintiff is unable to perform any ADLs due to a 'fear' of falling." (Doc 265-5 at 2.) Given that Ms. Shipman is neither a physician nor does not have any medical experience, the Court agrees that Ms. Shipman's declaration is inadmissible. The Court did not consider Ms. Shipman's declaration in its determination.

For the foregoing reasons, the Court denies Defendant's motion to exclude Dr.

Constantine Moschonas (Doc. 262).

### 10.   Elliott Flood

Plaintiff engaged Elliott Flood to opine about Defendant's background information and financial health, its compliance with generally accepted industry customs, standards, and practices, its own employees' and expert's testimony related to industry standards, and the institutional root causes of Defendant's alleged noncompliance with claims handling industry practices. (Doc. 263.) Defendant moves to exclude Mr. Flood's opinions for offering (1) improper legal conclusions, (2) Defendant's and its employees' state of mind conclusions, (3) irrelevant opinions, (4) Defendant's financial incentives, financial reserves, and net worth, (5) root cause analysis, and (6) claims handling practices. (*Id.*)

### a.   Legal Conclusions

Expert witnesses cannot give opinions in the form of legal conclusions. *See Nationwide Transp. Fin.*, 523 F.3d at 1058. Courts prohibit experts from interpreting the law and advising how the law should apply to the facts of a case because this testimony can circumvent the fact-finder's decision-making capability. *Pinal Creek Grp.*, 352 F. Supp. 2d. at 1042. Mr. Flood offers several opinions that constitute legal conclusions: (1) "Prudential lacked a good faith belief that [Plaintiff] committed fraud" (Doc. 263-1 at 20); (2) "[I]t would be futile for [Plaintiff] to file a new claim" (*id.* at 21); and (3) Defendant engaged in "a severe form of cherry picking, which is a severe form of misrepresentation because it creates a false impression" (Doc. 263-2 at 17). The Court agrees that these statements amount to legal conclusions. As an expert, Mr. Flood may address the factual question of whether an insurer deviated from the customs, practices, and standards of the insurance industry, but not the ultimate legal issue of whether Defendant breached the insurance agreement or acted in bad faith. *See Hangarter*, 373 F.3d at 1016-17 (concluding that an expert witness was permitted to testify about insurance industry standards and not directly about legal conclusions was proper).

### b.   State of Mind

Defendant argues that Mr. Flood offers multiple opinions regarding Defendant and

Defendant's employees' state of mind. (Doc. 263 at 5.) Plaintiff argues that the Court need not rule on these statements now but instead reserve this issue for trial. (Doc. 290 at 8.)

Defendant identifies the following statements made by Mr. Flood either in his report or deposition testimony as improper state of mind conclusions:

> (1) "[D]eviations from industry practices for good faith claim handling are institutionalized at Prudential as a company strategy to address the unprofitability of the abandoned line of business" (Doc. 263-1 at 17);
>
> (2) "The likelihood of future reserve increases is high. This will further add to the incentive for management at Prudential to push the [Fraud, Waste, and Abuse ("FWA")] strategy" (*id.* at 19);
>
> (3) Prudential attempted to "intimidate" Mrs. Finkelstein through its [Corporate Investigation Department] investigation and referral to the [Department of Insurance] (*See* Doc. 263-2 at 22-26);
>
> (4) Prudential demonstrated "utter indifference" to the effect the referral to the [Department of Insurance] could have, instead caring about its financial objectives (*See id.* at 29-30);
>
> (5) FWA personnel "are looking at their mission is to get just the biggest dollar claims they can" (*id.* at 32);
>
> (6) Prudential "consciously designed [the] FWA initiative to focus on the biggest saving possible" (*id.* at 33);
>
> (7) "And all the evidence points in the direction of what they care about is the bottom line. They're indifferent to the rights of the insureds" (*id.*);
>
> (8) Prudential "knew or should have known" the fraud referral to the [Department of Insurance] was "sloppy, unsupported, [and would not] go anywhere" (*id.* at 34);
>
> (9) The director of Prudential's FWA program was "looking for a profit center" and "looking to run this [] profitably" (*id.* at 35);
>
> (10) Prudential is "indifferent to the normal standards for fraud" and "the strategy is to make money in the line of business that they abandoned in 2012" (*id.*);
>
> (11) "[T]he company has this very strong emphasis on profits with no regard for the interest of the insured and not being falsely accused of fraud" (*id.* at 41);
>
> (12) The director of Prudential's FWA program is "perceiving his job as what's important about his job is how much money

he saves on claims" (*id.* at 43);

(13) The director of the FWA program "understands his mission . . . is to deny as many claims as possible" (*id.* at 45);

(14) "[I]f [Prudential] had a good faith belief she was a fraud, they would not have put her on waiver [of] premium." (*id.* at 48.).

(*See* Doc. 263 at 5-6.)

"Courts routinely exclude as impermissible expert testimony as to intent, motive or state of mind." *McGee v. Zurich Am. Ins. Co.*, No. CV-17-04024-PHX-DGC, 2021 WL 6070590, at *8 (D. Ariz. Dec. 22, 2021) (quoting *Siring v. Oregon State Bd. Of Higher Edu.*, 927 F.Supp. 2d 1069, 1077 (D. Or. 2013)). Permitting such expert testimony about state of mind "would be merely substituting the expert's judgment for the jury's and would not be helpful." *Id.* The Court agrees that these conclusions from Mr. Flood amount to improper state of mind testimony that experts are precluded from opining. *See, e.g., Barten v. State Farm Mut. Auto. Ins. Co.*, No. CV-12-00399-TUC-CKJ, 2015 WL 11111309, at *3 (D. Ariz. Apr. 8, 2015) (prohibiting expert from "testify[ing] as to common sense, state of mind, narrative facts of which he has no personal knowledge, or credibility"). Thus, these statements and similar state of mind conclusions made by Mr. Flood shall be excluded.[4]

### c.    Irrelevant Opinions

Defendant argues that Mr. Flood's opinion that Defendant should not have reported Plaintiff's claim to the Arizona Department of Insurance is irrelevant and should be excluded. (Doc. 263 at 7.) Plaintiff argues that Defendant's claim regarding relevance is better served for a motion in limine rather than a *Daubert* motion. (Doc. 290 at 10.) Here, Defendant's arguments do not challenge the expertise and reliability of Mr. Flood but the relevancy of this specific testimony. The Court declines to address the relevance of Mr. Flood's testimony about the Department of Insurance claim at this juncture. Defendant may

---

[4] In her response to this motion, Plaintiff argues that Defendant's insurance expert Ms. Mueller "made several missteps" and similar improper state of mind conclusions. (Doc. 290 at 7-8.) Plaintiff did not move to exclude Ms. Muller's testimony, so the Court will not address these claims here.

1    assert its objection as to its relevance as this case gets closer to trial.

2                    **d.      Financial Incentives and Reserves**

3            Defendant argues that Mr. Flood's testimony regarding financial incentives and

4    reserves is irrelevant and based on insufficient facts and data. (Doc. 263 at 11- 12.) Plaintiff

5    argues that the financial incentives and reserves are relevant because these will show that

6    the financial pressure changed how Defendant managed long-term care claims. (Doc. 290

7    at 10-11.)

8            To meet the requirements of Rule 702, an expert opinion must rely on sufficient

9    facts or data and result from the application of reliable principles and methods. The expert's

10   opinion must fit the case such that it is relevant. *Daubert*, 509 U.S. at 589-95. The Court

11   agrees that Mr. Flood does not provide sufficient facts and data to support his testimony

12   about Defendant's financial incentives and reserves. Mr. Flood opines that he reviewed the

13   performance evaluations of Stephen Dube and Geoffrey Camlin, members of Defendant's

14   fraud, waste, and abuse team, and that it is not industry practice to offer raises or bonuses

15   to reduce claims payments. (Doc. 263-1 at 14-15.) In his report, instead of providing

16   specific examples tying raises and bonus payment to reduced claims payment, Mr. Flood

17   provides only examples of Mr. Dube and Mr. Camlin performing their jobs. (*Id.*) Nothing

18   in Mr. Flood's report or testimony provides specific examples of financial incentives given

19   to Mr. Dube and Mr. Camlin, meaning that Mr. Flood's testimony that financial incentives

20   exist is speculative. In addition, Mr. Flood opines that he does not know the actual reserve

21   for any claims because none has been produced in this case. (*See* Doc. 263-2 at 54; Doc.

22   78 at 2.) Thus, Mr. Flood's testimony about Defendant providing financial incentives and

23   its financial reserves is precluded because it relies on insufficient facts and data. *See Friend*

24   *v. Tim Mfg. Co.*, 422 F.Supp. 2d 1079, 1081 (D. Ariz. 2005) ("An expert's testimony may

25   be excluded where it is based on subjective beliefs or unsupported speculation which is no

26   more than unreliable *ipse dixit* guesswork.").

27                    **e.      Net Worth**

28            Defendant argues that Mr. Flood intends to offer an outdated, unauthenticated

1   financial statement to opine on Defendant's net worth with a "simple mathematical
2   calculation that anyone with basic knowledge of arithmetic can make." (Doc. 263. at 16.)
3   Plaintiff claims that these are statutory financial statements that Mr. Flood will use "to
4   inform the jury what this document is, what it shows, and how it leads to [Defendant's]
5   reported net worth." (Doc. 290 at 17.) The Court agrees that an expert is not required to
6   opine about the net worth calculation, as "[a] jury does not need help with simple
7   mathematics as to which there is no dispute." *See United States v. Colorado City, Arizona*,
8   No. 3:12-cv-8123-HRH, 2015 WL 11163601, at *1 (D. Ariz. 2015). Thus, Mr. Flood is
9   precluded from opining about the net worth of Defendant.

### f.   Root Cause Analysis

10
11   Defendant argues that the root cause opinion in Mr. Flood's report should be
12   excluded because it is vague, confusing, and unhelpful. (Doc. 263 at 13.) Plaintiff claims
13   that Mr. Flood cites "The Institute of Internal Auditors" as the source for the methodology.
14   (Doc. 290 at 13.)

15   The Court finds the "root cause" opinion in Mr. Flood's report vague and without
16   any methodology, analysis, or even a coherent reason for the "cause" of "defects in insurer
17   internal controls." (Doc. 263-1 at 9.) Mr. Flood does footnote that "[t]he Institute of
18   Internal Auditors has a discussion of root cause analysis at IIA Practice Advisory 2320-2:
19   Root Cause Analysis." (*Id.*) However, he does not explain how he applies that methodology
20   to reach his conclusion. The only "root cause" Mr. Flood identifies is "the root cause of the
21   problem is excessive focus of company strategy on termination of claims in the LTC
22   Legacy Business, impacting claims like [Plaintiff's]." (*Id.* at 17.) As gatekeepers, trial
23   judges make a preliminary assessment about the admissibility of expert testimony, which
24   requires them to assess the reliability of the evidence. *Daubert*, 509 U.S. at 589. Given the
25   lack of explanation about how Mr. Flood reached his root cause conclusion, this evidence
26   shall be excluded.

### g.   Claims Handling Procedures and Practices

27
28   Defendant argues that Mr. Flood should not be permitted to discuss four exhibits

attached to his expert report, specifically Exhibits 4 through 7, claiming that it cannot ascertain what opinions Mr. Flood will offer based of these exhibits. (Doc. 263 at 14-15.) Plaintiff claims that Mr. Flood used these exhibits to support his opinion about insurance industry standards. (*Id.* at 14.) Plaintiff argues that these exhibits were submitted to comply with Rule 23(a)(2)(B) to provide any "facts or data considered by the witness" and "any exhibits that will be used to summarize or support them." (Doc. 290 at 15.)

Rule 26(a)(2)(B), Fed. R. Civ. P., requires that the expert report include "facts or data considered by the witness" and "any exhibits that will be used to summarize or support them." The exhibits define and outline insurance industry terms, roles, and processes. (*See* Doc. 263-1 at 24-98.) Mr. Flood includes these to provide a "basic understanding of the insurance business." (*Id.* at 6-7.) These exhibits support Mr. Flood's testimony about insurance claims handing and industry practices. Exhibit 4 gives a brief overview defining key terms and flow charts and diagrams that Mr. Flood may use during his testimony. (*Id.* at 24-34.) Exhibit 5 provides peer-reviewed excerpts from a textbook that summarizes claims handling customs, practices, and standards. (*Id.*at 36-63.) With Exhibit 6, Mr. Flood identifies examples of good faith use of independent medical examinations from a textbook. (*Id.* 64-78.) Exhibit 7 offers background information about special investigation units and is cited as support in Mr. Flood's report. (*See id.* 6-7, 11, 79-98.) As an insurance industry expert, Mr. Flood may address the factual question of whether an insurer deviated from the industry standard, but not the ultimate legal issues of whether the Defendant breached the insurance contract or acted in bad faith. *See Hangarter*, 373 F.3d at 1016-17 (concluding that an expert witness was permitted to testify about insurance industry standards and not directly about legal conclusions was proper). Thus, Mr. Flood may use the exhibits to opine about the customs, practices, and standards of the insurance industry.

The Court therefore grants in part, as discussed herein, Defendant's motion to exclude Elliot Flood (Doc. 263).

### 11.  Laura Parker

Plaintiff engaged Laura Parker to offer opinions about Defendant's claims handling

practices. Defendant seeks to exclude Ms. Parker's opinions and testimony regarding insurance claims handling in long-term care situations because her proffered opinions are impermissible legal conclusions and medical opinions. (Doc. 264 at 2.)

Ms. Parker has over twenty-five years of experience in the insurance industry and has specific experience with processing insurance claims and long-term care insurance industry practices. (Doc. 264-1 at 3.) The Court finds her to be an expert. Ms. Parker, however, offered legal conclusions including that Defendant failed to comply with its duty of good faith and fair dealing. (Doc. 264-1 at 26.) She dedicates multiple pages of her report for practices that violate the NAIC Model Unfair Claims Settlement Practices Act and the Arizona Unfair Claims Settlement Practice Act. (*Id.* at 19-23.) Similarly, Ms. Parker opines about how to interpret "substantial assistance," an insurance policy term at dispute in this case (Doc. 264-1 at 27-28). *See Evanston Ins. Co. v. Murphy*, 544 F.Supp.3d 879, 884 (D. Ariz. 2021) ("The interpretation of an insurance contract is a question of law."). Ms. Parker also opines about legal conclusions when she reported that Defendant inappropriately shifted the burden to prove eligibility on the insured (Doc. 264-1 at 20, 27). *See id.* at 885. Ms. Parker also concludes that Defendant's decisions were financially motivated—opining about Defendant's state of mind. (*Id.* at 26-27.) As an expert, Ms. Parker may address the factual question of whether an insurer deviated from the industry standard, but not the interpretation of legal issues. *See Hangarter*, 373 F.3d at 1016-17. Nor can she offer opinions of Defendant's or its agents' state of mind. Regarding Ms. Parker's "medical opinions," Plaintiff agrees that Ms. Parker is not a medical expert and shall not be used to provide medical opinions. (Doc. 289 at 9.) Thus, Ms. Parker may only opine about the customs, practices, and standards of the insurance industry.

The Court therefore grants in part, as discussed herein, Defendant's motion to exclude Laura Parker (Doc. 264).

### 12.   Dr. Kamran Samakar

Plaintiff engaged Dr. Kamran Samakar to respond to the conclusions of Dr. John Nye, Defendant's third-party administrator CHCS Services, Inc.'s medical director.

Dr. Samakar opines that as a general surgeon, Dr. Nye is not qualified to opine about how Plaintiff's Meniere's disease and Chiari malformation affected her capacity to perform activities of daily living. (Doc. 265-1 at 2.) Dr. Samakar, like Dr. Nye, is a board-certified general surgeon. (*Id.*) Defendant seeks to exclude Dr. Samakar's opinion claiming it is not based on any specialized knowledge, skill, training, education, or experience pertaining to the long-term care insurance industry. (Doc. 265 at 2.) Defendant also argues that Dr. Samakar's opinion is speculative and contrary to applicable law. (*Id.* at 4-9.)

As discussed, an expert need not be a specialist, but instead "be of a certain profession, such as a doctor." *Doe*, 971 F.2d at 385. Further, lack of specialized knowledge impacts the weight of the expert's testimony, not the admissibility of the testimony. *Garcia*, 7 F.3d at 890. Therefore, as a general surgeon, Dr. Samakar possesses the expertise to opine about general surgeons and their education and medical expertise. Presumably, Dr. Samakar will use his experience as a general surgeon to offer testimony about the veracity of Dr. Nye's conclusions. *See Sandoval-Mendoza*, 472 F.3d at 655; *see also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").

Defendant argues that Dr. Samakar's opinion disregards 26 U.S.C. § 7702(B)(c)(4) and Arizona Administrative Code § R20-6-1002(A), which broadly permit a general surgeon to make eligibility determinations under a long-term care policy. (Doc. 265 at 7-8.) This argument, however, amounts to Defendant disagreeing with Dr. Samakar's conclusions, not his expertise. Defendant can test the sufficiency of these opinions and attempt to discredit them at trial using its own evidence and expert witnesses. *See Daubert*, 509 U.S. at 596. Indeed, Defendant's knowledge of Dr. Nye's qualifications and underlying analysis of the medical record helps ameliorate concerns regarding the admissibility of Dr. Samakar's opinions. To the extent Defendant believes the record does not support Dr.

1    Samakar's conclusions, it is uniquely positioned—having ordered Dr. Nye's report and

2    supplying him with the insurance claim file—to expose any inadequacies or inconsistencies

3    in Dr. Samakar's opinions. There is no reason to believe a jury would not understand or

4    give weight to Defendant's arguments.

5    　　　The Court therefore denies Defendant's motion to exclude Dr. Samakar (Doc. 265).

6    **IV.　　CONCLUSION**

7    　　　Accordingly,

8    　　　**IT IS ORDERED denying** Defendant's Motion to Strike Untimely Disclosed

9    Witnesses, Documents and "Supplemental" Expert Report (Doc. 259).

10   　　　**IT IS FURTHER ORDERED granting in part and denying in part** Plaintiff's

11   Motion to Exclude Expert Testimony from Dr. Lorne Label on Meniere's Disease, Chiari

12   malformations, and Somatization Disorders (Doc. 266), as described herein.

13   　　　**IT IS FURTHER ORDERED denying** Plaintiff's Motion to Exclude Expert

14   Testimony from Dr. Abraham Jacob (Doc. 270).

15   　　　**IT IS FURTHER ORDERED granting** Plaintiff's Motion to Exclude Expert

16   Testimony from Defendant on Life Expectancy and Co-Morbidities (Doc. 267).

17   　　　**IT IS FURTHER ORDERED granting** Plaintiff's Motion to Exclude Expert

18   Testimony from Defendant on the Standards of a General Surgeon (Doc. 268).

19   　　　**IT IS FURTHER ORDERED granting in part and denying in part** Plaintiff's

20   Motion to Exclude Expert Testimony from Drs. Label and Jacob on Policy Interpretations

21   (Doc. 269), as described herein.

22   　　　**IT IS FURTHER ORDERED granting** Defendant's Motion to Exclude the

23   Opinions and Testimony of Plaintiff's Experts Dr. Michael D. Freeman and Mark Reiser,

24   PhD. (Doc. 260).

25   　　　**IT IS FURTHER ORDERED denying** Defendant's Motion to Exclude the

26   Opinions and Testimony of Plaintiff's Expert Dr. Dan Heffez. (Doc. 261).

27   　　　**IT IS FURTHER ORDERED denying** Defendant's Motion to Exclude the

28   Opinions and Testimony of Plaintiff's Non-Retained Expert Constantine Moschonas

(Doc. 262).

**IT IS FURTHER ORDERED granting in part and denying in part** Defendant's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert Elliot Flood (Doc. 263), as described herein.

**IT IS FURTHER ORDERED granting in part and denying in part** Defendant's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert Laura Parker (Doc. 264), as described herein.

**IT IS FINALLY ORDERED denying** Defendant's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert Dr. Kamran Samakar (Doc. 265).

Dated this 23rd day of October, 2023.

Michael T. Liburdi
United States District Judge